**Mark THOMPSON, Plaintiff,**

v.

**E.I. DuPONT deNEMOURS & CO., Defendant.**

**No. 00–70367.**

United States District Court, E.D. Michigan, Southern Division.

May 21, 2001.

Debra A. Fried, Saginaw, MI, for petitioner.

Leah H. Maguire, Louis Theros, Detroit, MI, for respondent.

### OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

## I. INTRODUCTION

Plaintiff Mark Thompson commenced this action on or around December 22, 1999 in Macomb County Circuit Court, State of Michigan, asserting a claim of disability discrimination under the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and a retaliation claim under Michigan's Elliott–Larsen Civil Rights Act (the "Elliott–Larsen Act"), Mich. Comp. Laws § 37.2101 *et seq.*[1] In his Complaint, Plaintiff alleges that he suffered from serious hip and back conditions in early 1998, and that, rather than seeking to accommodate these conditions, his employer, Defendant E.I. DuPont deNemours & Co., forced him to retire under a reduced disability pension on November 30, 1998, when he was just 33 years old. Plaintiff further alleges that Defendant retaliated against his testimony in March of

---

1. Count III of Plaintiff's Complaint is a retaliation claim brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* However, in his response to the present motion, Plaintiff asserts that his retaliation claim is a "state claim," (Plaintiff's Response Br. at 31), and Plaintiff's allegations elsewhere in his Complaint and in his response brief are consistent with this contention. Thus, the Court will assume that Plaintiff has abandoned his federal claim of retaliation under Title VII.

1998 in support of a fellow employee's civil rights action against Defendant. On January 21, 2000, Defendant removed the case to this Court, citing both Plaintiff's assertion of federal claims and diversity of citizenship among the parties. *See* 28 U.S.C. §§ 1331, 1332(a), 1367(a), 1441(a).

By motion filed on November 21, 2000, Defendant now seeks summary judgment in its favor on each of Plaintiff's claims. In support of this motion, Defendant principally argues (i) that Plaintiff's claim of disability discrimination fails for lack of evidence that Defendant could have reasonably accommodated his permanent medical restrictions; and (ii) that Plaintiff has not established a causal connection between a protected activity and an adverse employment action, as necessary to sustain his retaliation claim. Plaintiff responded on December 8, 2000, contesting each of the points raised in Defendant's motion. On December 21, 2000, Defendant filed a reply brief in further support of its motion.

The Court held a hearing on Defendant's motion on April 26, 2001. Having considered the arguments of counsel at this hearing, and having reviewed the parties' briefs and exhibits and the record as a whole, the Court now is prepared to rule on Defendant's motion. This Opinion and Order sets forth the Court's rulings.

## II. *FACTUAL BACKGROUND*

### A. The Parties

Plaintiff Mark Thompson began working for Defendant DuPont deNemours & Co. in 1993. Between 1993 and January of 1998, Plaintiff was employed as a paint dispersion operator at Defendant's Mount Clemens facility. As part of the process of making paint, Plaintiff was required to lift heavy batches of ingredients. In January of 1998, Plaintiff began to experience severe pain in his left hip, and this condition ultimately led to total hip replacement sur-

gery in April of 1998. All are agreed that, as a result of this condition, Plaintiff is no longer able to work in his prior position as a dispersion operator.

### B. Plaintiff's Medical Condition and Forced Disability Retirement

In January of 1998, when Plaintiff was just 32 years old, he began to experience pain in his left hip and lower back. As discussed in greater detail below, this led to a series of absences from work between January and March of 1998. Following various, more conservative treatments which failed to improve his condition, Plaintiff produced a note from his physician, Dr. Clifford Curtis, in late March of 1998, indicating that Plaintiff would be absent from work until April 21, 1998, when he was to undergo a total left hip replacement. Based on this doctor's statement, Defendant's plant physician, Dr. Aida Khalil, placed Plaintiff on sick and accident leave pending his surgery.

Throughout the next few months following this surgery, Plaintiff and his physicians were in regular contact with his supervisors or Dr. Khalil regarding Plaintiff's inability to return to work. For instance, Dr. Khalil's records indicate that he spoke with Plaintiff's orthopedic surgeon, Dr. Nathaniel Narten, on June 25, 1998, and that Dr. Narten stated that Plaintiff was scheduled for an office visit on July 15, after which he might be approved to return to "light duty" work. (*See* Plaintiff's Response, Ex. K, Chronological Medical Record at 5.) However, in light of Plaintiff's hip surgery, as well as a herniated disc in the lumbar spine region, Dr. Narten expressed his doubt whether Plaintiff would ever be capable of performing a job involving heavy lifting. (*Id.*)

Shortly thereafter, in July of 1998, Dr. Khalil received a note from Dr. Narten

stating that Plaintiff could return to work on August 1, 1998, but subject to the restrictions of: (i) no lifting, pushing, or pulling of weight in excess of five pounds; (ii) sitting down 100 percent of the time; (iii) no climbing; and (iv) no repetitive bending. (*See id.; see also* Defendant's Motion, Ex. 1, Dr. Narten note dated 7/9/98.) Dr. Narten's note indicated that there was no end date for these restrictions, and that he would re-evaluate Plaintiff's condition in October of 1998. Upon reviewing this note, Dr. Khalil approved Plaintiff's return to work subject to these restrictions, and she noted in her records that she would reconsider the matter in four weeks.

On August 1, Plaintiff failed to appear for work. Instead, he first used some of his accrued vacation days, and then began calling in sick. On August 17, 1998, Dr. Khalil received a fax from Plaintiff's neurologist, Dr. Mark Watts, excusing Plaintiff from work for several days and prescribing bedrest and no activity. Dr. Khalil also reviewed medical records that, in his view, were consistent with earlier reports that Plaintiff suffered from a herniated disc. Thus, Plaintiff continued on medical leave throughout August.

At this point, Plaintiff was approaching six months of medical leave. Because, in Defendant's view, Plaintiff was about to exhaust his short-term disability benefits under the company's sick and accident leave policy, Dr. Khalil began to confer with Plaintiff's supervisor, Eugene Elwart, and Defendant's employee relations specialist, Frank Mistretta, regarding this issue and Plaintiff's possible eligibility for a total and permanent disability retirement.[2] Mistretta has testified that he, along with

Dr. Khalil, reviewed the production jobs available at Defendant's Mount Clemens facility, and that, in light of the restrictions imposed by Plaintiff's physicians, he concluded that Plaintiff would be unable to perform any of these jobs. To this end, rather than asking Plaintiff to report for work, Defendant instead summoned Plaintiff to the plant's medical department for a meeting on September 1, 1998, to inform him of the company's decision to apply for total and permanent disability benefits on his behalf.

This September 1 meeting was attended by Plaintiff, Dr. Khalil, Frank Mistretta, Eugene Elwart, Plaintiff's other direct supervisor, Jon Passmore, and a union representative, Dean Teschler. Plaintiff and Teschler were not told in advance that a total and permanent disability retirement would be addressed at the meeting; rather, Plaintiff claims that he was advised only that the meeting concerned his disability status. Plaintiff has testified that Elwart began the meeting by stating that, in light of the information received from Plaintiff's doctors, Plaintiff was "damaged goods" and was "no longer good to us as an employee." (Plaintiff's Dep. at 187.) Mistretta then advised Plaintiff that, in light of his medical conditions and restrictions, there were no positions for him at the Mount Clemens facility, and that the only option, therefore, was for company officials to prepare an application for total and permanent disability benefits and submit it on Plaintiff's behalf. Plaintiff and Teschler responded by asking whether there was not, in fact, some job in the plant that Plaintiff could perform, despite his medical restrictions. More specifically, Teschler and Plaintiff mentioned certain

---

**2.** In its motion, Defendant denies that Elwart was involved in this process. Dr. Khalil's records, however, state that Elwart appeared in the plant's medical department on August 17, 1998 to advise Dr. Khalil that Plaintiff had

"exceeded his 6 months disability," and that Elwart intended to "contact [Plaintiff] to get more information from his physician to find out his prognosis and his restrictions." (Plaintiff's Response, Ex. K at 5.)

positions which primarily involved data entry, and were told, with respect to at least one of these proposed jobs, that it was not a permanent classification to which Plaintiff could be assigned.[3]

Following the September 1 meeting, Mistretta and Dr. Khalil prepared the documentation necessary to enroll Plaintiff in Defendant's total and permanent disability program. This application was approved in November and, effective December 1, 1998, Plaintiff's employment with Defendant was terminated and he was placed into total and permanent disability retirement. Under this program, Plaintiff receives sixty percent of his most recent annual earnings, for so long as he is unable to work. He also received full medical benefits for two years from the date of termination.

As discussed in greater detail below, Plaintiff also applied for Social Security disability benefits. He testified that he was told to do so by Dr. Khalil at the September 1 meeting, (*see* Plaintiff's Dep. at 191), and the record also includes evidence that Plaintiff was required to apply for these benefits under the terms of Defendant's total and permanent disability plan, (*see* Plaintiff's 1/11/01 Motion to Strike, Ex. C, Disability Plan brochure.) The parties dispute the legal significance of Plaintiff's application for Social Security disability benefits. In any event, Plaintiff's claim was denied at the initial and reconsideration stages, and he has stated

in an affidavit that he elected not to seek a hearing or further pursue this claim, in light of his belief that he was, in fact, capable of working, at least with accommodations. (*See* Plaintiff's Motion to Strike, Ex. B, Plaintiff's Aff. at ¶¶ 2–3.)

## C. The Allegations in Support of Plaintiff's Retaliation Claim

Apart from claiming that Defendant violated the ADA by failing to seek a reasonable accommodation of his disabilities, and instead forcing him into a disability retirement, Plaintiff also alleges that Defendant retaliated against his lawful exercise of protected activity under Michigan's Elliott–Larsen Act. In his Complaint, he cites two instances in which he engaged in protected activities: (i) his testimony in March of 1998 on behalf of a fellow employee, Morris Martin, in an age discrimination suit brought against Defendant; and (ii) his March 16, 1998 filing of a charge of discrimination with the Michigan Department of Civil Rights ("MDCR"). Plaintiff now concedes that the MDCR apparently failed to process this charge or serve Defendant with a copy, and that Defendant, therefore, was unaware of this exercise of protected activity. Thus, his claim of retaliation rests solely on his testimony in the Martin matter.

Plaintiff alleges that Defendant retaliated against this protected activity in two ways. First, he claims that Defendant's failure to identify a job he could perform

---

**3.** On the same day as this meeting was held, Plaintiff's neurologist, Dr. Watts, sent a letter to Dr. Khalil expressing his opinion that Plaintiff "is able to work." (Plaintiff's Response, Ex. L, Watts 9/1/98 letter.) While confirming that Plaintiff's "symptoms have remained largely unchanged," Dr. Watts stated that Plaintiff "is able to do any kind of work that does not require heavy lifting and bending or twisting," and that "[s]ome modicum of light lifting is perfectly reasonable." (*Id.*) He further stated that "[i]n fact,

a job where he actually is not in one place for a long time, which enables him to get up frequently to carry out certain tasks[,] would probably be best, particularly in light of his back pain symptoms [which] become severe when staying in one position." (*Id.*) As discussed below, Plaintiff cites this letter as evidence that Defendant used an overly restrictive view of his medical limitations in determining that there were no jobs that Plaintiff was capable of performing.

despite his medical restrictions, and its decision instead to place him into total and permanent disability retirement, was motivated in part by his exercise of protected activity.

Next, as alluded to earlier, Plaintiff cites his disputes with Defendant regarding his use of sick leave in late February and early March of 1998 as an example of Defendant's retaliation against his exercise of protected activity. According to Defendant, Plaintiff failed to provide the necessary medical documentation for his absences from work on February 20, 21, 22, 25, 26, and 27, and March 3 and 4, and so, in accordance with company policy, Plaintiff's supervisors denied his request for sick pay for these dates.[4]

Plaintiff, however, offers a far different view of the events surrounding his request for sick pay. First, Plaintiff points out, and Defendant does not dispute, that on February 24, 1998, he hand-delivered to Defendant's medical staff a note from his attending physician, Dr. Jitendra Katneni, requesting that Plaintiff be excused from work between February 19 and March 5, a period which would encompass all of the disputed absences. Defendant contends that this note alone was insufficient, and that, as a matter of company policy, it was necessary for Dr. Khalil to contact Dr. Katneni before approving Plaintiff's absences. Defendant further asserts that, as Plaintiff was hand-delivering Dr. Katneni's note on February 24, he also instructed Defendant's medical staff, and changed a medical authorization document to reflect, that Dr. Katneni was to be contacted only regarding Plaintiff's kidney problems, and not about any other medical conditions.

(*See* Defendant's Motion, Ex. 6, Geers Aff. at ¶ 3; Defendant's Motion, Ex. 7, Medical Authorization Letter with change initialed 2/24/98). Because Dr. Katneni's note apparently addressed Plaintiff's problem with his hip, and not a kidney condition, Defendant's medical personnel concluded that they could not contact Dr. Katneni to confirm the information set forth in the note excusing Plaintiff from work until March 5.

Again, Plaintiff disputes Defendant's characterization of this incident. First, he denies that Defendant has an inviolate policy requiring prior written authorization before the plan's medical staff may contact an employee's physician, and he cites examples in the past where Defendant purportedly contacted his doctors without such authorization. Next, Plaintiff asserts that his intention in modifying his medical authorization form on February 24 was merely to notify Defendant's medical staff that he was changing physicians, from Dr. Katneni to Dr. Curtis, so that any subsequent inquiries should be directed to his new doctor; Plaintiff denies that it was his intention to prohibit the medical staff from contacting Dr. Katneni.

Finally, and in any event, Plaintiff notes that on March 4, 1998, he signed new forms authorizing Drs. Katneni and Curtis to release his medical records to Defendant's medical staff and to speak to Dr. Khalil regarding his conditions. (*See* Plaintiff's Response, Exs. H, I.) Plaintiff further points to Dr. Khalil's notes from early March that she had received calls, statements, and records from Plaintiff's physicians regarding his condition. Thus, in Plaintiff's view, Defendant cannot plau-

---

**4.** Plaintiff filed a grievance protesting this decision on April 26, 1998. At the second step of the process, his grievance was denied by his supervisor, Eugene Elwart, on the ground that Plaintiff had failed to cooperate with Defendant's medical staff in securing the nec-

essary medical information demonstrating the reasons for his absences. Plaintiff ultimately was compensated for these days, in connection with his termination and placement into total and permanent disability retirement status.

sibly contend that it lacked medical documentation in support of Plaintiff's requests for sick pay. Yet, despite all this, and despite Dr. Khalil's apparent approval of Plaintiff's absences from a medical standpoint upon reviewing the records, Plaintiff's supervisors denied his requests for sick pay for the period between February 20 and March 4, notifying Plaintiff of this decision on March 13, 1998.

## III. *ANALYSIS*

### A. The Standards Governing Defendant's Motion

In its present motion, Defendant seeks an award of summary judgment in its favor on both Plaintiff's federal disability discrimination claim and his state-law claim of retaliation. Under the relevant Federal Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment.[5] According to the *Celotex* Court:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

■ After reviewing the above trilogy, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be

---

**5.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice & Procedure,* § 2727, at 33 (1993 Supp.).

granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989). *See also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in considering Defendant's motion.

## B. Plaintiff's ADA Claim

■ In Count I of his Complaint, Plaintiff alleges that he is a qualified person with a disability within the meaning of the federal Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.,*, and that he requested an accommodation of his disability, but that Defendant refused to provide this reasonable accommodation, and instead forced him into total and permanent disability retirement. In order to prevail on this ADA claim, Plaintiff must show (1) that he is disabled within the meaning of the federal statute; (2) that he was qualified to perform either the job he previously held or another available job, with or without reasonable accommodation; and (3) that he was denied a reasonable accommodation of his disability, or otherwise suffered an adverse employment decision because of his disability. *See Burns v. Coca–Cola Enterprises, Inc.*, 222 F.3d 247, 253 (6th Cir.2000); *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).

For purposes of its present motion, Defendant assumes that Plaintiff can satisfy the first, "disabled" prong of this three-part test, by virtue of his hip and back conditions.[6] Defendant, however, maintains that Plaintiff has failed to produce sufficient evidence to sustain his burden under the latter two prongs of this test. In particular, Defendant contends: (i) that Plaintiff failed to adequately propose an objectively reasonable accommodation of his medical restrictions; (ii) that Plaintiff's application for Social Security benefits precludes him from satisfying the "qualified" element of his ADA claim;[7] and (iii) that, in any event, Plaintiff has not identified any available positions for which he was qualified, with or without reasonable accommodation. For the reasons discussed below, the Court finds that genuine issues of fact remain with respect to the first two of these contentions, but that Defendant is entitled to summary judg-

6. Indeed, it would be difficult for Defendant to argue otherwise, in light of the conclusion of its officials that Plaintiff should be placed into total and permanent disability retirement.

7. This argument has spawned another round of disputes between the parties. In particular, on January 11, 2001, Plaintiff filed a motion requesting that this argument be stricken as untimely, on the ground that Defendant purportedly raised it for the first time in its reply brief. Alternatively, Plaintiff sought leave to submit a supplemental brief addressing this issue. For its part, Defendant brought a motion on January 12, 2001, requesting leave to submit Plaintiff's application for Social Security benefits as a supplemental exhibit which was not yet available at the time Defendant filed its motion for summary judgment. Plaintiff has opposed this request, arguing that any delay in obtaining this document was solely attributable to Defendant and its counsel.

Upon considering these motions, the Court finds it best not to allow the substantive issues in this case to be obscured by purely collateral procedural squabbles. To be sure, as Plaintiff points out, Defendant relegated the fact of Plaintiff's application for Social Security benefits to a footnote in its initial brief in support of its motion for summary judgment, and did not truly argue this issue until its reply brief. Yet, the issue nevertheless was raised well before the hearing on Defendant's motion, and the parties have now had ample opportunity to brief this issue through the above-cited supplemental motions. Thus, having reviewed these supplemental materials, and having heard the arguments of counsel on this issue at the April 26 hearing, the Court elects to address this issue here.

ment in its favor on the basis of its third argument.

### 1. Plaintiff Made a Sufficient Request to Trigger Defendant's Duty under the ADA to Attempt to Accommodate His Disabilities.

 Defendant's first challenge to Plaintiff's ADA claim begins with the observation, as stated by the Sixth Circuit, that Plaintiff "bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Monette v. Electronic Data Systems Corp.,* 90 F.3d 1173, 1183 (6th Cir.1996); *see also Burns,* 222 F.3d at 259 ("[P]rior decisions of this court hold that an employee has the burden of identifying particular positions to which he could be reassigned based on his qualifications." (Footnote with citations omitted)). In this case, Plaintiff wrote to Defendant on December 14, 1998, and "formal[ly] request[ed]" that the company "provide me with reasonable accommodation for my medical situation." (Defendant's Motion, Ex. 14.) Then, on January 11, 1999, Plaintiff again wrote to his former employer, stating his "second formal request" for accommodation, and identifying eight positions at the Mount Clemens plant that he believed he could perform. (Defendant's Motion, Ex. 15.) Defendant, however, argues that these requests came too late, and that Plaintiff failed to propose any sort of specific, reasonable accommodation of his medical restrictions at the appropriate point—namely, during the September 1, 1998 meeting when the parties met to discuss Plaintiff's disability status, or at any other time prior to Plaintiff's termination on December 1, 1998. Rather, Defendant asserts that Plaintiff made only a "vague" request at the September 1 meeting, which, under the controlling precedents, is insufficient to satisfy his threshold burden of proposing an accommodation. *See, e.g., Cassidy v. De-*

*troit Edison Co.,* 138 F.3d 629, 635 (6th Cir.1998) (finding that the plaintiff's "proposed accommodation for essentially an allergen-free workplace" was "simply too vague to reasonably inform Defendant of a reasonable accommodation").

Acceptance of this argument, however, would require the Court to disregard the principle that all factual questions must be resolved in favor of Plaintiff as the nonmoving party, and to overlook the context in which the September 1 meeting was held. Regarding the first of these points, Defendant seemingly ignores the unrefuted testimony of Plaintiff's union representative, Dean Teschler, that he specifically identified a so-called "BRP job" at the September 1 meeting, and that he more generally inquired about the availability of any typing positions. (Teschler Dep. at 87–88.) Plaintiff's testimony corroborates this point, and also flatly belies Defendant's claim that Plaintiff "admit[ted] that he did not in fact request specific accommodations at the September 1, 1998 meeting." (Defendant's Motion, Br. in Support at 11.) In fact, Plaintiff squarely testified:

Q: Oh, okay. What did you say?

A: What did I say?

Q: In that meeting.

A: I asked about—I raised the lab position, BRP position, QS 9000 position, jobs that required employees to sit down, data entry, and jobs of that nature.

Q: Any other specific jobs you recall referencing during that meeting?

A: No. I remember Mr. Teschler was saying the same thing and asking almost the same identical questions that I was.

(Plaintiff's Dep. at 367.) While, as discussed below, Defendant offers a variety of reasons why these suggested positions were not reasonable accommodations, it cannot plausibly deny, in the face of this testimony, that a sufficiently specific re-

quest was made at the September 1 meeting to take this case outside the rule set forth in *Cassidy* and the other relevant Sixth Circuit decisions.[8]

Next, and as pointed out in Plaintiff's response brief, Defendant has somewhat overstated the nature of the employee's initial burden to request an accommodation. Both the governing EEOC regulations and the courts recognize that the ADA contemplates an "interactive process," through which both the employer and the employee seek to identify a reasonable accommodation of the employee's disability. *See* 29 C.F.R. § 1630.2(*o*)(3); *see also Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 311–12 (3d Cir.1999); *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1171–72 (10th Cir.1999) (en banc); *Beck v. University of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996). Although Defendant appears to suggest that the rule in this circuit might be different, Plaintiff correctly observes that Defendant has, somewhat conveniently, quoted only the first of two consecutive propositions set forth by the Sixth Circuit in *Burns, supra:*

> In order to establish a prima facie case of disability discrimination under the statute, [the plaintiff] must show that he requested, and was denied, reassignment to a position for which he was otherwise qualified. *Alternatively, [the plaintiff] could show . . . that he re-*

> *quested and was denied some specific assistance in identifying jobs for which he could qualify.*

*Burns,* 222 F.3d at 258 (emphasis added).

With these principles in mind, the Court returns to the parties' September 1 meeting in this case. First, both Plaintiff and Teschler testified, and Defendant does not dispute, that they specifically inquired at the September 1 meeting whether there were other positions at the plant that might accommodate Plaintiff's medical restrictions. If there were any uncertainty in the minds of Plaintiff's supervisors or Defendant's human resources or medical personnel as to the types of accommodations that might be needed, they could have sought clarification during the parties' meeting on September 1, or at any time thereafter. Tellingly, there is no evidence that any of these individuals did so. "The interactive process would have little meaning if it was interpreted to allow employers, in the face of a request for accommodation, simply to sit back passively, offer nothing, and then, in post-termination litigation, try to knock down every specific accommodation as too burdensome." *Taylor,* 184 F.3d at 315.

Indeed, the record readily permits, and perhaps even compels, a particular inference as to why Defendant's officials failed to follow up on Plaintiff's and Teschler's

---

8. Indeed, notwithstanding the language in *Cassidy* and elsewhere regarding "vague" requests for accommodations and the employee's burden to identify specific positions, the Court notes that its research has not uncovered a single Sixth Circuit case in which an employee's "vague" request wholly excused the employer from any further inquiry regarding jobs that the employee might be able to perform. In *Cassidy*, for example, despite the vague nature of the plaintiff's request, the defendant employer still "attempted numerous accommodations," but ultimately concluded, through these efforts, that there was no vacant position which would accommodate the plaintiff's medical condition. *See Cassidy*, 138 F.3d at 635. Moreover, the unpublished Fourth Circuit decision cited in Defendant's brief, *Crawford v. Union Carbide Corp.*, 202 F.3d 257, 1999 WL 1142346, at *6 (4th Cir.1999), did not merely involve a vague request for an accommodation, but a vague statement by the plaintiff employee—*i.e.,* that "this room is awfully dirty"—that could not readily be construed as even seeking an accommodation by the employer.

inquiries about possible accommodating positions—namely, that these officials already had performed a similar inquiry, and had concluded that there were no such positions. Specifically, Defendant's employee relations specialist, Frank Mistretta, testified at his deposition that, prior to the September 1 meeting, he and Dr. Khalil had already reviewed the production jobs available at Defendant's Mount Clemens facility, and had concluded that Plaintiff would be unable to perform any of these jobs. According to Mistretta's own testimony, then, the September 1 meeting was not an opportunity for the parties to engage in an "interactive process," or for Plaintiff to suggest possible accommodations. Rather, it is fair to surmise from the record that this meeting was called, plainly and simply, for Defendant's officials to announce their prior, non-negotiable decision to place Plaintiff into total and permanent disability retirement.

Viewed in this context, it is somewhat disingenuous for Defendant to argue that it was not sufficiently apprised of Plaintiff's desire to be transferred to a position that could accommodate his medical restrictions. Moreover, to insist that Plaintiff must have expressly identified specific positions at the September 1 meeting would exalt form over substance, as Defendant maintains in this litigation that it had *already* evaluated Plaintiff's ability to perform various specific jobs *before* the parties met on September 1. This, then, simply is not a case where an employee's "vague" statements were insufficient to inform the employer of the nature of the employee's disability, or to alert the employer of the need to engage in an interactive process of exploring possible accommodations. Accordingly, Defendant's first argument in support of its motion is wholly without merit.

## 2. Plaintiff's Application for Social Security Disability Benefits Does Not Foreclose His Claim under the ADA.

Next, turning to the "qualified" prong of the ADA inquiry, Defendant argues that Plaintiff cannot possibly satisfy this element of his claim, in light of his purportedly inconsistent statement to the federal Social Security Administration ("SSA") that he is unable to work because of a disabling condition. In order to collect Social Security Disability Insurance ("SSDI") benefits, a claimant must show that he suffers from a disability that prevents him from performing his prior job or "any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). By applying for these benefits in November of 1998, then, Plaintiff effectively made such an assertion as to the extent of his disabilities and his inability to work in light of his medical restrictions. According to Defendant, this statement to the Social Security Administration is flatly inconsistent with his present contention, for purposes of this litigation, that he is able to perform certain jobs at Defendant's Mount Clemens facility, at least with some accommodation for his medical limitations.

The Supreme Court recently addressed this very issue in *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). The Court ruled that the "two seemingly divergent statutory contentions" required to receive SSDI benefits and to prevail under the ADA "are often consistent," and that "pursuit, and receipt, of SSDI benefits does not automatically estop the recipient from pursuing an ADA claim." 526 U.S. at 797, 119 S.Ct. at 1600. The Court further held, however, that "an ADA plaintiff cannot simply ignore her SSDI contention that she was too disabled to work," but

instead "must explain why that SSDI contention is consistent with her ADA claim that she could 'perform the essential functions' of her previous job, at least with 'reasonable accommodation.'" 526 U.S. at 798, 119 S.Ct. at 1600.

In addressing the apparent tension between a claim of "disability" in an application for SSDI benefits and a claim of "qualified" under the ADA, the Court explained that there are at least three ways of reconciling these contentions. The first of these turns upon the concept of "reasonable accommodation":

> [A]s we have noted, the ADA defines a "qualified individual" to include a disabled person "who ... can perform the essential functions" of her job *"with reasonable accommodation"* .... By way of contrast, when the SSA determines whether an individual is disabled for SSDI purposes, it does *not* take the possibility of "reasonable accommodation" into account, nor need an applicant refer to the possibility of reasonable accommodation when she applies for SSDI. The omission reflects the facts that the SSA receives more than 2.5 million claims for disability benefits each year; its administrative resources are limited; the matter of "reasonable accommodation" may turn on highly disputed workplace-specific matters; and an SSA misjudgment about that detailed, and often fact-specific matter would deprive a seriously disabled person of the critical financial support the statute seeks to provide. The result is that an ADA suit claiming that the plaintiff can perform her job *with* reasonable accommodation may well prove consistent with an SSDI claim that the

plaintiff could not perform her own job (or other jobs) *without* it.

526 U.S. at 803, 119 S.Ct. at 1602 (citations omitted). Accordingly, the Court found that the "context-related legal conclusion" of "disability" under Social Security law does not invariably conflict with the legal conclusion under the ADA that an individual is capable of working with reasonable accommodation. 526 U.S. at 802, 119 S.Ct. at 1601.[9]

The next possible distinction recognized by the Court stems from the specialized administrative process adopted by the SSA to decide claims for SSDI benefits. As noted in *Cleveland*, the SSA employs a "five-step procedure that embodies a set of presumptions about disabilities, job availability, and their interrelation." 526 U.S. at 804, 119 S.Ct. at 1602. These presumptions "grow out of the need to administer a large benefits system efficiently," but "they inevitably simplify, eliminating consideration of many differences potentially relevant to an individual's ability to perform a particular job." 526 U.S. at 804, 119 S.Ct. at 1603. Thus, in the Court's view, "an individual might qualify for SSDI under the SSA's administrative rules and yet, due to special individual circumstances, remain capable of 'perform[ing] the essential functions' of her job." 526 U.S. at 804, 119 S.Ct. at 1603.

Finally, the Court recognized the important distinction between an application for SSDI benefits and an award of benefits:

> [I]f an individual has merely applied for, but has not been awarded, SSDI

---

9. The Court was careful to limit its ruling to this conflict among legal standards, and specifically declined to address "directly conflicting statements about purely factual matters, such as 'The light was red/green,' or 'I can/cannot raise my arm above my head.'"

526 U.S. at 802, 119 S.Ct. at 1601. In the present case, Defendant has not identified any purely factual contentions made by Plaintiff in connection with his application for SSDI benefits that contradict factual assertions he has made in this case.

benefits, any inconsistency in the theory of the claims is of the sort normally tolerated by our legal system. Our ordinary rules recognize that a person may not be sure in advance upon which legal theory she will succeed, and so permit parties to "set forth two or more statements of a claim or defense alternately or hypothetically," and to "state as many separate claims or defenses as the party has regardless of consistency." Fed. Rule Civ. Proc. 8(e)(2). We do not see why the law in respect to the assertion of SSDI and ADA claims should differ. 526 U.S. at 805, 119 S.Ct. at 1603.

■ Returning to the present case, *Cleveland* requires that Plaintiff explain how his statement of "disability" in support of his application for SSDI benefits is consistent with the position taken in this case that he is capable of performing certain jobs at Defendant's Mount Clemens facility. Plaintiff seeks to discharge this obligation by appealing to the first and third sorts of "explanations" identified by the Court in *Cleveland.* This Court finds the latter explanation sufficient, and thus does not address the former.

Because Plaintiff's application for SSDI benefits was rejected, both initially and on reconsideration,[10] this case is a candidate for the "pleading in the alternative" expla-

nation posited by the Supreme Court in *Cleveland.* Moreover, the record provides ample support for this explanation. Specifically, Plaintiff asserts that he was *required* to apply for SSDI benefits, despite his doubt that he qualified for such an award. In support of this contention, Plaintiff first quotes from a "Disability Plans" brochure distributed by Defendant, which plainly states that, under Defendant's Total and Permanent Disability Income Plan, Plaintiff was "required to apply and, if necessary, reapply for disability benefits from" the SSA, among other sources. (Plaintiff's 1/11/01 Motion to Strike, Ex. C at 6.) Plaintiff then states, in affidavits and in his deposition testimony, that he was instructed by certain of Defendant's officials that he must apply for SSDI benefits. (*See* Plaintiff's Motion to Strike, Ex. B, Plaintiff's 1/10/01 Aff. at ¶ 1; Plaintiff's 2/5/01 Reply Br. in Support of Motion to Strike, Ex. G, Plaintiff's 2/2/01 Aff. at ¶ 4; Plaintiff's Dep. at 191.) Defendant has produced nothing to contradict these contentions.[11]

Thus, accepting Plaintiff's view of the events of September of 1998, he was told *both* that he was being placed into total

10. Following these rejections, the attorney assisting Plaintiff in his application for SSDI benefits prepared and filed a "Request for Hearing" form, in anticipation of moving to the next step of the administrative process. However, Plaintiff refused to sign this form, and instead instructed his attorney to withdraw this request.

11. Instead, Defendant seeks to cast doubt on Plaintiff's credibility by suggesting that he has offered inconsistent accounts of the reason why he applied for SSDI benefits. The Court, however, fails to see how Plaintiff's claim that *one* representative of Defendant or its benefit plan instructed him to file for SSDI benefits is contradicted by a further statement that *another* of Defendant's representatives *also* advised him of this requirement. Moreover, in its claims, first, that Plaintiff "never mentioned his belief that he was required to apply for [SSDI] benefits in his deposition testimony," (Defendant's 1/29/01 Response to Motion to Strike at 5), and, second, that, if he did, he testified only about a "helpful suggestion" offered by Dr. Khalil, (*see* Defendant's 2/13/01 Reply Br. in Support of Motion to File Supplemental Exhibit at 3), Defendant seemingly has overlooked the following deposition testimony by Plaintiff recounting the events of the September 1 meeting with plant management:

Q: Doctor Khalil, what does she say?
A: She tells me to go apply for Social Security and all this stuff.
Q: What's all this stuff?
A: I need to go apply for Social Security and try to get my life in order, or something like that, and just good luck ....
(Plaintiff's Dep. at 191.)

and permanent disability retirement, *and* that he was required, under the terms of the total and permanent disability plan, to apply for SSDI benefits. Even assuming that Plaintiff already anticipated, at that early date, that he would pursue an ADA claim against his employer, it would have been rather bold of him to assume that he ultimately would prevail on that claim, so that he could safely disregard Defendant's instruction that he apply for SSDI benefits and thereby risk forfeiting the benefits he would, if all else failed, receive under Defendant's total and permanent disability plan. The Court does not read *Cleveland*'s "explanation" requirement as compelling a litigant in Plaintiff's position to run such a risk in order to preserve the viability of his ADA claim.

To the contrary, *Cleveland* expressly recognizes that the mechanism of pleading in the alternative is designed for just this sort of occasion, where a litigant believes that he is entitled to prevail under one of two mutually inconsistent theories of recovery. Here, there is even less reason to treat Plaintiff as "bound" by one of these two theories—namely, his claim of "disability" on his application for SSDI benefits—where it appears that he pursued this theory only begrudgingly and at the direction of Defendant, and where this theory was rejected by the SSA. Consequently, the Court finds that Plaintiff's unsuccessful application for SSDI benefits does not preclude him from establishing the "qualified" prong of his claim under the ADA.

### 3. Plaintiff Has Not Identified Any Available Position at Defendant's Plant That Would Constitute a Reasonable Accommodation of His Disabilities.

Having resolved the above, somewhat peripheral matters, the Court now turns to the principal question upon which the continued viability of Plaintiff's ADA claim hinges: namely, whether he has produced sufficient evidence from which it could be concluded that he is qualified, with or without accommodation, to perform either his prior job or another available position. In this case, all are agreed that Plaintiff's medical restrictions preclude him from returning to his former position as a paint dispersion operator, and that no reasonable accommodation can alter this fact. Defendant further contends that Plaintiff has failed to identify any other available position to which he was eligible to transfer, and for which he was otherwise qualified despite his disability. Upon considering the candidate jobs identified by Plaintiff, the Court agrees.

The starting point in the Court's inquiry is the language of the ADA itself. The statute defines a "qualified individual with a disability" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA further provides that "reasonable accommodation" may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). Reading these two provisions in tandem, it is apparent that a proposed accommodation through reassignment, such as the one sought by Plaintiff here, is not "reasonable" unless the employee can perform the essential functions of the target position, with or without reasonable accommodation. *See Smith, supra,* 180 F.3d at 1178; *Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 678 (7th Cir.1998).[12] The ADA,

---

12. As pointed out in *Dalton,* a court would confront an "infinite regression on the accommodation issue" if "reasonable accommodation" in the target position were to include transfer to yet a third job. *Dalton,* 141 F.3d at 678. Thus, in the case of reassignment, the second level of "reasonable accommodation" necessarily is limited to its more traditional forms, such as modification of facilities or job restructuring.

however, does not further delineate the "universe of jobs to which the employer must look when it considers reassignment to a vacant position." *Dalton,* 141 F.3d at 677.

■ The Sixth Circuit has adopted a burden-shifting regimen to govern this "qualified" inquiry. The plaintiff employee bears the initial burden of showing that he is capable of performing the job in question despite his disability, either (a) without any accommodation by the employer; (b) with an alleged "essential" job requirement removed; or (c) with a proposed reasonable accommodation. *Monette,* 90 F.3d at 1186. If the plaintiff pursues the second of these three avenues of proof, asserting that he can perform the job minus one of its stated requirements, the defendant employer then bears the burden of proving that this challenged job criterion "is essential, and therefore a business necessity." 90 F.3d at 1186.[13] Alternatively, if the plaintiff's proofs establish that he can perform the job with a proposed accommodation, and that this accommodation is both reasonable and possible, the employer then bears the burden of proving that this proposed accommodation would impose an undue hardship. *Monette,* 90 F.3d at 1186.

In support of his claim that he is "qualified" under the above statutory framework, Plaintiff has identified three candidate positions which, in his view, were available in the Mount Clemens plant during the relevant time frame, the fall of 1998, and were capable of being performed by someone with his medical restrictions: (1) the so-called "BRP operator" position; (2) the "warehouse controller" position; and (3) certain "R & D Lab" positions.

The Court considers each of these proposed reassignments in turn.

### a. The "BRP Operator" position

As the first proposed reassignment for which he assertedly was qualified despite his disability, Plaintiff points to the so-called "BRP operator" position. The record indicates that this "BRP" assignment came into existence in 1997, and involved inputting data as part of Defendant's effort to computerize its inventory system. Although it initially was created as a "temporary" position, (*see* Plaintiff's Response, Ex. Y), it eventually was designated as a permanent position in July of 2000, (*see* Plaintiff's Response, Ex. Z). Further, Plaintiff has identified at least two individuals, Lakisha Griffith and Alicia (Baker) Sandling, who initially were assigned to these "temporary" positions during their pregnancies, but who were retained in these positions when they were made permanent.

In challenging Plaintiff's identification of the BRP position as one that he could have performed, Defendant first contends that "BRP operator" does not truly describe a separate, discrete position at its Mount Clemens facility. Rather, Defendant asserts that employees who were assigned BRP duties were also required to perform their regular production duties when necessary. Because Plaintiff concedes that he could not perform his prior production duties as a paint dispersion operator, Defendant argues that he has failed to establish his ability to perform *all* of the functions associated with the "job" of BRP operator, assuming such a job could be said to exist at all.

**13.** This Court has elsewhere expressed its view that this shifting of the burden of persuasion to the defendant employer is problematic, as it "effectively turns on its head the burden of proof in an ADA case." *Hamlin v. Charter Township of Flint,* 942 F.Supp. 1129, 1137–38 (E.D.Mich.1996). Nevertheless, this approach remains the law in this Circuit. *See Hoskins v. Oakland County Sheriff's Dep't,* 227 F.3d 719, 724 (6th Cir.2000).

In response, Plaintiff points to the deposition testimony of two individuals who formerly performed BRP duties, Dean Teschler and Kevin Mayes. This cited testimony, while considerably less than clear on the question, does appear to suggest that at least some BRP operators performed only data entry tasks, and not production duties. (*See* Teschler Dep. at 30–31, 38–39; Mayes Dep. at 27–28.) Moreover, the job description in the record, (*see* Plaintiff's Response, Ex. Y), does not indicate that there were any production duties associated with this position.[14] More generally, the mere existence of this job description tends to belie Defendant's contention that there was no such discrete job as "BRP operator." Thus, Plaintiff contends, and the Court agrees, that there are questions of fact as to whether Defendant has carried its burden of showing that production duties were an "essential function" of the BRP position.

■ Next, Defendant argues that the "temporary" BRP job is not part of the relevant universe of reassignments that it was obliged to consider as an accommodation of Plaintiff's "permanent" disability. In support of this contention, Defendant points to the Sixth Circuit's recent ruling in *Hoskins v. Oakland County Sheriff's Dep't,* 227 F.3d 719 (6th Cir.2000). The plaintiff in that case, Susan Hoskins, was a deputy sheriff whose duties included transporting prisoners from the county jail to detention. Following an injury in which she fractured her clavicles, Hoskins was no longer able to physically restrain inmates. Upon concluding that this was an essential function of the deputy sheriff position, so that Hoskins could not perform her former job without some sort of accommodation, the Court then considered several of her proposed accommodations.

Two of these proposals are particularly relevant here. First, Hoskins suggested that she could be reassigned to an intake position, which required only answering telephone calls and taking walk-in reports from the public. The Sixth Circuit, however, held that this reassignment was not a reasonable accommodation, where the intake position "did not exist during the time in which the defendants attempted to find a suitable assignment for Hoskins (fall of 1997), or at the time she was fired on November 7, 1997," but instead was created over a year later. *Hoskins,* 227 F.3d at 729. While recognizing that "an employer may be required to reassign an individual to a position that is currently unavailable but that will become vacant within a reasonable amount of time," the Court found that the intake position was neither available when the defendant employer learned of Hoskins' disability, nor "anticipated in the near future." 227 F.3d at 729.

■ Next, Hoskins proposed that she be permanently reassigned to a position in one of the control booths within the county jail facility, where she would be responsible for operating the control panel to permit officers to enter and leave the cell blocks, and where she would have no contact with inmates. The defendants responded that this reassignment would not be reasonable, because the control booth duties were considered "easier" and "a break" for the prison employees, so that, "in fairness to everybody," all of the deputies were rotated through this control booth position "so that everybody had a chance to have their break." 227 F.3d at 730. Upon considering, as an issue of first impression, whether "a reasonable accommodation would include turning a rotating or relief position into a permanent posi-

---

**14.** This job description actually is for a "key user" position, and not a "BRP operator" position, but the parties evidently agree that these terms are interchangeable.

tion," the Sixth Circuit held that the ADA imposed no such duty on employers:

> ... Hoskins suggests that she be assigned to a rotating-type job on a permanent basis. We agree that Hoskins's request would essentially require the creation of a new position rather than reassignment to an otherwise existing vacant one. As we have made clear, an employer's duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so. We therefore conclude that Hoskins has not met her burden of showing that her proposed accommodation is a reasonable one.

227 F.3d at 730 (citations omitted).

In so ruling, the Court relied in part on two Seventh Circuit decisions, *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 696–98 (7th Cir.1998), and *Dalton, supra,* 141 F.3d at 677–80. Both of these cases involved requests by employees with permanent medical restrictions that they be placed into light-duty positions which, according to the defendant employers, were temporary set-aside positions reserved for employees recuperating from temporary restrictions. In both cases, the Seventh Circuit held that "[t]he ADA does not compel an employer to reduce the number of bona fide temporary jobs it has set aside ... and to convert them to permanent positions for its disabled employees." *Hendricks–Robinson,* 154 F.3d at 697; *Dalton,* 141 F.3d at 680.[15] The Court reasoned that "it would frustrate the ADA for permanently impaired employees to fill temporary light-duty assignments when those jobs have been set aside specifically for recuperating employees." *Hendricks–Robinson,* 154 F.3d at 697.

Returning to the present case, Plaintiff argues that these precedents are distinguishable in important respects. First, unlike the temporary set-aside program at issue in *Dalton,* there is no indication that Defendant specially reserved the BRP operator positions for temporarily disabled employees. Although some employees with temporary restrictions, such as the two pregnant employees identified earlier, were placed into these positions during a period of disability, the BRP duties apparently were also assigned to other individuals, such as Kevin Mayes, who were not disabled at the time. Thus, it cannot be said here, as it was in *Hendricks–Robinson* and *Dalton,* that the accommodation of employees with temporary disabilities might be jeopardized by assigning a permanently restricted employee to a temporary light-duty position as a BRP operator.

This being the case, Plaintiff argues that, while Defendant was not compelled to accommodate his admittedly permanent restrictions by reassigning him to the temporary BRP operator position on a permanent basis, he at least was entitled to this position for the time being, while the parties continued to investigate other alternatives. To conclude otherwise, in Plaintiff's view, would be to treat him differently from other, non-disabled employees, any of whom could have sought and been assigned to a vacant BRP operator position for so long as this temporary job continued in existence.

Plaintiff's argument, however, overlooks a significant distinction between his circumstances and needs and those of a non-disabled employee. If the BRP operator position came to an end—as Plaintiff concedes it was envisioned to do, and as actually occurred in at least some cases, (*see* Mayes Dep. at 14, 22, 29)—a non-disabled employee in that position could be—and

---

**15.** In *Hendricks–Robinson,* however, the Court found that there were questions of fact as to whether these light-duty positions truly were temporary. *Hendricks–Robinson,* 154 F.3d at 697.

was, for example, in the case of Kevin Mayes, (see id. at 20)—simply returned to his production duties. No such option was available to Plaintiff, given his permanent restrictions. Unless some other job could be identified before the expiration of the BRP operator position, Plaintiff would again face the prospect that he now seeks to avoid, total and permanent disability retirement. Moreover, viewing the situation from the relevant perspective of the late summer and early fall of 1998, when Defendant was advised that Plaintiff's medical restrictions were permanent, there was no particular reason to believe that some other reasonable accommodation would be identified before the BRP operator position ceased to exist.

█ In retrospect, of course, it is now known that the BRP position was made permanent in July of 2000, but this fact is unavailing to Plaintiff here. First, there is no evidence that Defendant could have anticipated this in the fall of 1998. As Hoskins makes clear, the reasonableness of an accommodation must be judged as of the date when the employer learns of the employee's disability, and a position which becomes available more than a year after this date does not qualify as a "reasonable accommodation." See Hoskins, 227 F.3d at 729. Moreover, while some BRP operator positions apparently survived the transition from temporary to permanent, others—the position held by Kevin Mayes, for instance, which was terminated in November of 1999, (see Mayes Dep. at 14)—did not, and the record provides no reason to suppose that Plaintiff might have been assigned to one of the positions in the former category. Thus, even charging Defendant with $^{20}\!/\!_{20}$ hindsight, the evidence does not compel the conclusion that the accommodation sought by Plaintiff would have succeeded in the long run.

In short, what Plaintiff required—in contrast to those otherwise comparable but non-disabled or temporarily disabled employees who volunteered for or were placed into BRP operator positions—was a permanent reassignment, in order to accommodate his admittedly permanent medical restrictions. The accommodation he has proposed, however, is a temporary, at best indefinite reassignment, with no assurance of a full and complete accommodation of his permanent medical restrictions. While one could argue that there is no harm in this proposal, and that, if all had gone well, it might have resulted in a full accommodation of Plaintiff's disabilities, Plaintiff has identified no authority for the imposition of such a flexible and open-ended "best efforts" duty to accommodate, entailing reassignments that might or might not accomplish the desired result. To the contrary, the Sixth Circuit has stated that "employers simply are not required to keep an employee on staff indefinitely in the hope that some position may become available some time in the future." Monette, 90 F.3d at 1187.

More importantly, the ADA itself speaks only of "reassignment to a vacant position," 42 U.S.C. § 12111(9)(B), and Plaintiff has failed to identify a vacant position in the fall of 1998 that would have fully accommodated his permanent disabilities. Assignment to a temporary BRP operator position would not have served this purpose, and the above-cited case law is clear that Defendant had no obligation to upgrade this job to permanent or indefinite status while awaiting a possible (but uncertain) long term solution. See also McCreary v. Libbey–Owens–Ford Co., 132 F.3d 1159, 1165 (7th Cir.1997) ("Occasional opportunities to work in another department are not equivalent to a vacancy for a permanent position."). Accordingly, the Court finds that the BRP position, as it existed in 1998, was not a candidate to reasonably accommodate Plaintiff's permanent disabilities.

### b. The "Warehouse Controller" position

 Next, Plaintiff points to the job of "warehouse controller" as one that he could have performed despite his restrictions. In response, Defendant points to its job description for this position, which states that the job requires (i) standing, walking, and some combination of stooping, kneeling, crouching or crawling between one-third and two-thirds of the time, (ii) the lifting of weights up to 25 pounds between one-third and two-thirds of the time, and (iii) occasional lifting of up to 50 pounds. (*See* Defendant's Motion, Ex. 12, Warehouse Controller Job Description.) If these were deemed essential functions, there is no doubt that Plaintiff's medical restrictions would prevent him from performing the job of warehouse controller.

Plaintiff, however, seeks to raise issues of fact on this question by pointing to the deposition testimony of Raymond Baker, who has worked as a warehouse controller for a number of years. Baker estimated that he spends between 80 and 90 percent of his time working at a computer in his office, and that any walking is limited to distances of less than 100 feet. (*See* Baker Dep. at 22–23, 28.) Baker stands at a work bench to perform some of his tasks, and also occasionally operates a stand-up forklift-like vehicle to move pallets around the warehouse. (*See id.* at 32, 75.)

Baker further testified that his job entails packaging quart and gallon containers and five-gallon pails of paint for shipment to customers. (*See id.* at 28–31.) While this is a "minimal part" of his job, Baker testified that this function requires lifting, pushing, and carrying of containers, and that it is sometimes necessary to reach up into seven- or eight-foot-high shelves or to bend down and reach into lower shelves to retrieve these containers. (*See id.* at 30–31, 35, 65–66.) The five-gallon pails are quite heavy, between 45 and 55 pounds, and Baker testified that handling them "can be a problem," and that, if they are not lifted or handled properly, "you end up with a lot of neck and back and shoulders ... aching quite a bit" and the task can prove "rather injurious." (*Id.* at 37–39, 75.) Baker stated, however, that some employees with physical restrictions are excused from handling the five-gallon pails, so that a number of workers who are employed as warehouse controllers never lift or move these pails. (*See id.* at 49–50, 77.)

Upon reviewing Baker's testimony, and even assuming that this testimony should be viewed as superseding the job requirements set forth in Defendant's formal written job description for the position of warehouse controller, the Court finds that this evidence does not raise a genuine issue of fact as to whether Plaintiff could perform the essential functions of this position. The job of warehouse controller plainly is not 100 percent sedentary, as required under the restrictions stated in Dr. Narten's July 9, 1998 note. Even if the job involves sitting at a computer approximately 80 to 90 percent of the time, the remaining 10 to 20 percent of the job requires standing, walking, and various lifting, reaching, bending, and other manipulative activities. Moreover, leaving aside the tasks involving the heavy five-gallon pails, Plaintiff's evidence still reveals that the warehouse controller position requires occasional lifting and handling of quart and gallon containers, and that the latter containers, at least, exceed the five-pound weight limit imposed by Dr. Narten. Thus, even as described by Raymond Baker, the job of warehouse controller nevertheless includes functions that are inconsistent with the medical restrictions imposed by Plaintiff's physician.

Plaintiff argues, however, that the restrictions set forth in Dr. Narten's July 9 note were somehow superseded by the

subsequent September 1, 1998 letter from his neurologist, Dr. Watts, opining that Plaintiff was able to work and that a 100–percent sedentary position was not required.[16] Yet, as Defendant points out, Dr. Watts was treating Plaintiff's back condition, and his opinion as to this disability says nothing about the restrictions necessitated by Plaintiff's hip condition, which was being treated by Dr. Narten. In any event, the Court agrees with Defendant that, if Plaintiff believed that Defendant's medical personnel were laboring under a misapprehension of the extent of his medical restrictions, it would have behooved him to clarify this, either at the September 1 meeting or soon thereafter. Nothing in the record suggests that he tried to do so. Accordingly, Plaintiff has not demonstrated that the "warehouse controller" position would have reasonably accommodated his disabilities.

### c. The "R & D Lab" positions

█ Finally, Plaintiff points to certain "R & D Lab" positions as reasonable accommodations of his medical conditions. However, Defendant responds that reassignment to these positions would have constituted a promotion, because an employee in such a position might earn as much as $500 per month more than what Plaintiff could earn as a paint dispersion operator, and because these employees have the authority to direct production employees in the manufacturing of paint. (*See* Defendant's Reply Br., Ex. E, Cannon Aff. at ¶¶ 4–5.)[17] As Defendant correctly points out, "a reassignment will not require ... promoting the disabled employee." *Cassidy, supra,* 138 F.3d at 634; *see also Smith, supra,* 180 F.3d at 1176–77; *Malabarba v. Chicago Tribune Co.,* 149 F.3d 690, 699–700 (7th Cir.1998). There seemingly is no dispute that the increased earning potential and authority in the R & D Lab positions, if established, would constitute a promotion over Plaintiff's former production job. *Cf. EEOC v. Humiston–Keeling, Inc.,* 227 F.3d 1024, 1029 (7th Cir.2000).

Plaintiff, however, asserts that there are issues of fact as to whether the R & D Lab positions do, in fact, offer the advantages claimed by Defendant. In particular, he points to the deposition testimony of two employees, Eric O'Neal and Stuart Ingersoll, who have moved from production jobs to positions in the R & D Lab. However, O'Neal's testimony actually indicates that his salary increased upon moving to the lab position, and he was only able to offer purely anecdotal testimony, not based upon first-hand knowledge or experience, that others making a similar move might

---

**16.** Plaintiff also argues that Dr. Narten's July 9 note should be read in tandem with his earlier comments to Dr. Khalil in late June of 1998 that, following Plaintiff's next office visit, he might be approved for light duty work. This Court, however, fails to see why Defendant's medical personnel should not have relied on the more recent communication from Dr. Narten as better reflecting Plaintiff's then-current medical restrictions, particularly where the earlier statements were more speculative and contingent on a future examination. Moreover, Plaintiff himself testified at his deposition that, in recent job searches, he has continued to operate under the restrictions identified by Dr. Narten in July and August of 1998. (Plaintiff's Dep. at 224.)

**17.** Defendant also argues that Plaintiff failed to take the tests necessary to qualify for these laboratory positions. Again, however, this ignores the unilateral nature of Defendant's decision, as announced at the September 1 meeting, that Plaintiff was not qualified to perform any available job at the Mount Clemens facility. If Defendant had instead engaged in a truly "interactive process" with Plaintiff, and if, in so doing, an R & D Lab position had been identified as a possible candidate for reassignment, Plaintiff presumably would then have had the opportunity to take any necessary tests.

not have experienced such an increase. (*See* O'Neal Dep. at 21.) In addition, Ingersoll was unable to say whether his earning potential increased upon moving to a lab position, and he testified only that he initially maintained his same level of pay upon assuming this job. (*See* Ingersoll Dep. at 61, 70.) Finally, Plaintiff has not directed the Court's attention to any testimony by either of these individuals bearing upon Defendant's claim of additional authority in the R & D Lab positions; O'Neal and Ingersoll stated only that they do not directly supervise any co-workers in this position. (*See* O'Neal Dep. at 21; Ingersoll Dep. at 61.) Accordingly, Plaintiff having failed to produce evidence sufficient to refute Defendant's claim that the R & D Lab position constitutes a promotion over Plaintiff's former job, the Court finds that this position does not assist Plaintiff in satisfying his burden of identifying an objectively reasonable accommodation of his disabilities.

In sum, having reviewed all of the positions identified by Plaintiff as possible means for Defendant to have reasonably accommodated his medical restrictions, the Court finds that Plaintiff has failed to establish the reasonableness of any of these proposals. It follows that Plaintiff cannot demonstrate that he is "qualified" within

the meaning of the ADA, and that Defendant is entitled to summary judgment in its favor on the claim brought under this federal statute.

## C. Plaintiff's State–Law Claim of Retaliation

As noted earlier, Plaintiff's claim of retaliation arises under Michigan's Elliott–Larsen Act, and rests solely on the protected activity of testifying in support of a fellow employee's civil rights action against Defendant. Plaintiff alleges that, as a result of this protected activity, Defendant retaliated by failing to compensate him for certain medically necessary absences in late February and early March of 1998, and by failing to reassign him to a different position in the fall of 1998 as a reasonable accommodation of his disabilities. In seeking summary judgment in its favor on this claim, Defendant argues that there is no evidence of the requisite causal connection between Plaintiff's protected activity and the allegedly retaliatory actions taken by Defendant.[18] The Court agrees.

 Under Michigan's Elliott–Larsen Act, the elements of a plaintiff's prima facie case of retaliation include (i) that the plaintiff engaged in protected activity; (ii) that the defendant knew of this activity;[19]

18. Defendant also contends that Plaintiff has not identified any materially adverse consequences he suffered as a result of Defendant's two acts of alleged retaliation. This argument is wholly without merit. As to the first cited instance of retaliation, Plaintiff suffered a loss of pay for the several days for which Defendant refused to approve his absences. As to the second, Plaintiff is suffering an ongoing loss of pay by receiving only 60 percent of his compensation when employed. The Court is aware of no authority holding that such deprivations of pay do not constitute "materially adverse" employment actions.

19. The Court notes that the evidence on this prong of Plaintiff's retaliation claim appears

to be quite sparse. As evidence that Plaintiff's supervisors "must have known" about his testimony in his co-worker's case, Plaintiff cites the deposition testimony of his second-line supervisor, Dennis Bergeon, in which he responded affirmatively to the question, "If an employee had to take time off in order to ... testify pursuant to subpoena, would he have to notify his supervisor of that?" (Bergeon Dep. at 53.) Plaintiff also cites his own deposition testimony that, in a conversation with his supervisor Jon Passmore in early March of 1998, he asked whether the dispute over proper medical authorization for his absences had "anything to do with me testifying against the company," and that Passmore allegedly responded "something to the extent if he were a company man, he knew what to say."

(iii) that the plaintiff suffered an adverse employment action; and (iv) that there was a causal connection between the protected activity and the adverse action. *See DeFlaviis v. Lord & Taylor, Inc.*, 223 Mich.App. 432, 566 N.W.2d 661, 663 (1997). In arguing that the "causal connection" element is missing with regard to its failure to provide sick pay for Plaintiff's absences in late February and early March of 1998, Defendant cites Plaintiff's testimony, as well as other materials in the record, indicating that he learned of this decision by his supervisors on March 13, 1998. Yet, Plaintiff did not testify in support of his co-worker's suit until March 25, 1998. It is difficult to imagine how one can establish a causal link between an adverse action and protected activity *which had not yet occurred.* Indeed, even assuming that Plaintiff's supervisors were aware of his forthcoming testimony when they made their decision on March 13, it is hard to see why they would wish to retaliate *in advance* against this activity, thereby seemingly increasing Plaintiff's willingness to testify adversely to the company's interests. In short, the Court finds nothing in the record that would support even the weakest inference of a causal connection between the March 13 decision of Plaintiff's supervisors and his subsequent March 25 testimony.[20]

■ Next, regarding the decision in the fall of 1998 not to reassign Plaintiff to a position which arguably would have accommodated his medical restrictions, Plaintiff's claim of retaliation with respect to this action is severely undermined by the Court's conclusion, as discussed earlier, that Defendant acted reasonably in concluding that no such accommodation was possible. In any event, Plaintiff has produced no direct evidence of. a causal link between his March 25 testimony and this action by his employer several months later.[21] To the extent that he relies on mere temporal proximity to make such a connection, the amount of time which passed actually works *against* a finding of a causal connection. As this Court recently observed, "any possible inference of a causal link is undercut by the passage of several months between" a plaintiff's protected activity and an employer's adverse employment action. *See Parker v. Key Plastics, Inc.*, 68 F.Supp.2d 818, 833 (E.D.Mich.1999). Accordingly, based on the absence of evidence of the requisite causal connection between protected activity and an adverse employment action, the Court finds that Defendant is entitled to summary judgment in its favor on Plaintiff's state-law claim of retaliation.

## IV. *CONCLUSION*

For the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's November 21, 2000 Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's January 11, 2001 Motion to

---

(Plaintiff's Dep. at 139–40.) These hypotheticals and vague statements are a far cry from direct evidence that Plaintiff's supervisors were aware of his protected activity.

**20.** Plaintiff's murky testimony about his conversation with his supervisor, Jon Passmore, is not to the contrary. This testimony indicates that Plaintiff, and not Passmore, suggested the possibility of retaliatory motive, and that Passmore responded vaguely about what a "company man" would do. This sim-

ply is insufficient to raise an inference of retaliatory motive in the subsequent refusal to provide sick pay.

**21.** While Plaintiff again seeks to rely on his testimony regarding his conversation with Passmore, this testimony not only lacks the necessary specificity to aid Plaintiff's claim of a causal connection, but there is no evidence that Passmore was involved in the decision to place Plaintiff into total and permanent disability retirement.

Strike Defendant's Untimely Argument and/or to Accept Plaintiff's Brief in Response is GRANTED IN PART, with the Court electing to resolve the matter by accepting and considering Plaintiff's supplemental briefs. Similarly, IT IS FURTHER ORDERED that Defendant's January 12, 2001 Motion to File a Supplemental Exhibit is GRANTED.

### JUDGMENT OF DISMISSAL

The Court having this day entered an Opinion and Order granting Defendant's motion for summary judgment,

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that this case be, and hereby is, dismissed in its entirety with prejudice.