**Mark P. THOMPSON, Plaintiff–Appellant,**

v.

**E.I. DUPONT DENEMOURS AND CO., Defendant–Appellee.**

No. 01–1854.

United States Court of Appeals, Sixth Circuit.

July 23, 2003.

Before RYAN, CLAY and GIBBONS, Circuit Judges.

GIBBONS, Circuit Judge.

██ Plaintiff-appellant Mark Thompson brought suit asserting a claim of disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and a retaliation claim under Michigan's Elliott–Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq.* Thompson contends that he suffered from serious hip and back conditions in 1998, which prevented him from working for at least six months. According to Thompson, rather than seeking to accommodate his medical conditions, his employer, defendant-appellee E.I. DuPont de-Nemours & Co. ("DuPont"), forced him to retire under a reduced disability pension. The district court granted DuPont's motion for summary judgment on both claims. Thompson appeals only the summary judgment ruling on his ADA claim, arguing that the district court erred in determining that Thompson failed to present evidence sufficient to create a genuine issue of material fact as to whether DuPont could have reasonably accommodated his permanent medical restrictions. For the reasons set forth below, we affirm the judgment of the district court.

## I.

Thompson began working for DuPont as a limited service employee, through an employment agency, on February 18, 1993. Thompson later became a full service employee of DuPont with a seniority date of June 19, 1993. From 1993 until the spring of 1998, Thompson was employed as a dispersion operator making paint at DuPont's Mount Clemens facility. The process of making paint is a physically demanding job that requires lifting heavy batches of ingredients.

In January of 1998, Thompson, who was then age 32, began to experience severe pain in his left hip. Due to the pain in his hip, Thompson was absent from work on numerous occasions between January and March of 1998. In late March, Thompson presented DuPont with a note from his family physician, Dr. Clifford Curtis, indicating that Thompson would be absent from work until April 21, 1998, at which time Dr. Nathaniel Narten, Thompson's orthopedic surgeon, would perform a total left hip replacement. Based on Curtis' statement, DuPont's plant physician, Dr. Aida Khalil, placed Thompson on sick and accident leave pending his surgery. Subsequent to Thompson's hip replacement surgery, Narten had Thompson evaluated for complaints of back pain. Thompson was eventually referred to Dr. Mark Watts, a neurosurgeon, who diagnosed Thompson with a herniated disc. It is undisputed that, as a result of his medical conditions, Thompson is no longer able to work in his prior position as a dispersion operator.

During the months following his surgery, Thompson and his physicians were in regular contact with Thompson's supervisors or Khalil regarding his inability to return to work. For example, Khalil's records indicate that on June 25, 1998, Narten told Khalil that Thompson was scheduled for an office visit on July 15, after which Thompson might be approved to return to "light duty" work, such as a sit-down job. However, Narten also expressed doubt that Thompson would be capable of per-

forming a job involving heavy lifting in the future. After this discussion, Khalil understood that Thompson would require permanent restrictions upon his return to work.

On or about July 28, 1998, Khalil received a note from Narten advising that Thompson could return to work on August 1, 1998, but he would be subject to the following restrictions: (1) no lifting, pushing, or pulling of weight in excess of five pounds; (2) sitting down 100 percent of the time; (3) no climbing; and (4) no repetitive bending. Narten's note stated that these restrictions would be in effect "forever."

Khalil approved Thompson's return to work subject to these restrictions. Thompson did not return to work on August 1, 1998. Instead, Thompson chose to remain off work, using some of his accrued vacation days and calling in sick. On August 17, 1998, Khalil received a fax from Watts excusing Thompson from work for several days. At the end of August, Thompson was approaching six months of medical leave. Therefore, DuPont believed that Thompson was close to exhausting his short-term disability benefits under the company's sick and accident leave policy. Accordingly, Khalil began to confer with Thompson's supervisor, Eugene Elwart, and DuPont's employee relations specialist, Frank Mistretta, about identifying a reasonable job accommodation for Thompson in light of his impairments and medical restrictions, and Thompson's possible eligibility for total and permanent disability retirement. Mistretta testified that he, along with Khalil, reviewed the production jobs available at DuPont's Mount Clemens facility. They determined that, in light of the restrictions imposed by Thompson's physician, Thompson would be unable to perform any of these jobs.

Instead of asking Thompson to report for work on September 1, 1998. DuPont requested that Thompson attend a meeting at the plant's medical department. In addition to Thompson. Khalil. Mistretta, Elwart, Jon Passmore (Thompson's other direct supervisor), and a union representative. Dean Teschler attended the meeting. DuPont did not inform Thompson or Teschler of the precise subject of the meeting. Rather, Thompson claims that he was advised only that the meeting concerned his disability status. In fact, the purpose of the meeting was to inform Thompson of DuPont's decision to apply for total and permanent disability benefits on his behalf.

During the meeting, Mistretta informed Thompson that due to his medical conditions and the resulting restrictions, there were no positions available for him at the Mount Clemens facility. Mistretta stated that the only option was for company officials to prepare an application for total and permanent disability benefits and submit it on Thompson's behalf. According to Thompson, Elwart told him that, in light of the information received from Thompson's physicians, Thompson was "damaged goods" and was "no longer good as a dispersion operator." Thompson and Teschler testified that they responded by inquiring as to whether there was some job that Thompson could perform, despite his medical restrictions. According to Teschler, he referred specifically to the position of BRP operator, which was a temporary sedentary position which came into existence in 1997 and involved inputting data as part of DuPont's effort to computerize its inventory system. Thompson testified that he also asked about the BRP operator position as well as lab positions and other positions that involved primarily data entry. DuPont responded that, at least with respect to the BRP operator

position, it was not a permanent classification to which Thompson could be assigned.

Following the September 1, 1998, meeting. DuPont prepared the documentation necessary to apply for total and permanent disability retirement on Thompson's behalf. This application was approved in November of 1998. Effective November 30, 1998, Thompson's employment with DuPont terminated and he was placed into total and permanent disability retirement. Pursuant to this program, Thompson receives sixty percent of his most recent annual earnings, amounting to approximately $30,000 per year, for so long as he is unable to work. Thompson also received full medical benefits for two years from the date of his termination.

In mid-September of 1998, after having performed a review of the possible job accommodations for Thompson and advising Thompson that DuPont intended to apply for total and permanent disability retirement on his behalf, Khalil received a letter from Watts regarding medical restrictions on Thompson's ability to work. According to Watts, Thompson can perform "any kind of work that does not require heavy lifting and bending or twisting." Watts further stated that "a job where [Thompson] actually is not in one place for a long time, which enables him to get up frequently to carry out certain tasks would probably be best." Khalil reviewed Watt's letter and determined that Thompson's work restrictions were "essentially the same" as those set forth by Narten. Despite the seemingly less limiting nature of the restrictions set forth by Watts, in November of 2000, Thompson testified that he continues to operate under the more severe restrictions imposed by Narten.

On December 14, 1998, after his employment with DuPont had terminated. Thompson wrote to DuPont requesting an accommodation to his disability. DuPont refused the mailing. Thompson filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on December 23, 1998. Thompson also filed a complaint with the Michigan state court alleging disability discrimination on December 22, 1998. DuPont received the complaint in early January of 1999. On January 11, 1999, Thompson again wrote to DuPont requesting accommodation. DuPont accepted the letter but did not revisit the issue of a job accommodation for Thompson.

The instant case was removed to federal court in January of 2000. On October 23, 2000. DuPont filed a motion for summary judgment, which the district court granted on May 21, 2001. This timely appeal followed.

## II.

This court reviews *de novo* a district court's grant of a motion for summary judgment. *See Braithwaite v. The Timken Co.*, 258 F.3d 488, 493 (6th Cir.2001). When reviewing the record, all inferences are to be drawn in the light most favorable to the non-moving party. *Id.* (citing *Woythal v. Tex–Tenn Corp.*, 112 F.3d 243, 245–46 (6th Cir.1997)). However, a party opposing a motion for summary judgment "may not rest upon mere allegations or denials of his pleading, but ... must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The party opposing the motion must "do more than simply show that there is some meta-physical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "If after reviewing the record as a whole a rational factfinder could not find

for the nonmoving party, summary judgment is appropriate." *Braithwaite*, 258 F.3d at 493 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir.1998)) (citation omitted).

Thompson argues that the district court erred in determining that he failed to identify any available position for which he was qualified, with or without reasonable accommodation, under the ADA. Thompson claims that he is a qualified person with a disability within the meaning of the ADA and that he requested accommodation of his disability, but that DuPont refused to provide such reasonable accommodation. In order to prevail on an ADA claim, a plaintiff must establish that (1) he is disabled; (2) he was qualified to perform either the job he previously held or another available job, with or without reasonable accommodation; and (3) he was denied a reasonable accommodation of his disability, or otherwise suffered an adverse employment decision because of his disability. *See Burns v. Coca–Cola Enterprises, Inc.*, 222 F.3d 247, 253 (6th Cir.2000); *Roush v. Weastec. Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).

Under the ADA, a "qualified individual with a disability" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA further provides that "reasonable accommodation" may include "reassignment to a vacant position." 42 U.S.C. § 12111(9)(B). Therefore, a proposed accommodation through reassignment is not "reasonable" unless the employee can perform the essential functions of the target position, with or without reasonable accommodation. *See Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1178 (10th Cir.1999); *Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 678 (7th Cir.

1998). Moreover, in considering reassignment, "[e]mployers are not required to create new jobs, displace existing employees from their positions, or violate other employee's rights under a collective bargaining agreement or other non-discriminatory policy in order to accommodate a disabled individual." *Burns*, 222 F.3d at 257.

If an employee is unable to perform his previous job, with or without accommodation, then he must show that he requested, and was denied, reassignment to a position for which he was otherwise qualified. *Burns*, 222 F.3d at 258–59. An employer is not required to reassign a disabled employee to a position for which he is not otherwise qualified. The employee bears the initial burden of showing that he is capable of performing the identified position in question despite his disability, either with or without a proposed reasonable accommodation by the employer. *Id.; see also Monette*, 90 F.3d at 1186.

## A. The BRP Operator Position

Thompson first claims that the district court erred in failing to find that there was a genuine issue of material fact as to whether reassignment to the position of BRP operator would have been a reasonable accommodation. Reassignment to a vacant position is a reasonable accommodation under the ADA. 42 U.S.C. § 12111(9)(B). If reassignment is appropriate, then "an employer 'should reassign [an] individual to an equivalent position . . . if the individual is qualified, and if the position is vacant within a reasonable amount of time.'" *Kiphart v. Saturn Corp.*, 251 F.3d 573, 586 (6th Cir.2001) (quoting 29 C.F.R. § 1630.2(o) app. at 358).

According to Thompson there were two "vacant" BRP operator positions available within the relevant time frame, including the position that became vacant in No-

vember 1998 and was filled by DuPont employee Kevin Mayes and the position of Chris Bykes. Thompson contends that he would have been entitled to Mayes' position if DuPont had properly engaged in the "interactive process" as required under the ADA because the process would have been ongoing through November of 1998, when the position filled by Mayes became vacant. While "an employer may be required to reassign an individual to a position that is currently unavailable but that will become vacant within a reasonable amount of time," an employer is not required to reassign an employee to a position that is not available when the employer is conducting its review of positions or where availability is not anticipated in the near future. *See Hoskins*, 227 F.3d at 729 (finding that the employer was not required to reassign the employee to a position that is not available "when [the employer] learned of [the employee's] disabling injury nor was its availability anticipated in the near future"); *see also Kiphart*, 251 F.3d at 586. Moreover, "[e]mployers simply are not required to keep an employee on staff indefinitely in the hope that some position may become available some time in the future." *Monette*, 90 F.3d at 1187. Because the position held by Mayes was not vacant within the relevant time frame, Thompson has failed to raise a genuine issue of material fact regarding this position.

With regard to Bykes' position, Thompson claims that because Bykes was less senior than Thompson, under DuPont's medical placement policy he was entitled to "bump" Bykes from the BRP operator position. DuPont responds that because this position was occupied by Bykes, it was not "vacant." Assuming DuPont's policy would allow Thompson to bump Bykes,

that policy should be given its full effect. If a more senior employee is permitted under such policy to bump a less senior individual, then the position held by the less senior employees may be considered "vacant." *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 122 S.Ct. 1516, 1521–22, 152 L.Ed.2d 589 (2002) (finding that when a position, which was held by a disabled employee, became open to seniority-based bidding, like all similar jobs periodically did, the position was "vacant" for purposes of the ADA). Therefore, Bykes' position may be considered "vacant" for purposes of determining whether Thompson was qualified to be reassigned to the position.

While an employer must reassign a disabled employee to a vacant position if the employee is qualified, an employer is not required to reassign a permanently disabled employee to a temporary position for recuperating employees or a rotating-type position. *See Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 730 (6th Cir. 2000); *Dalton*, 141 F.3d at 680 (finding that the ADA does not compel an employer to convert temporary positions it has set aside for rehabilitation of injured employees into permanent positions for its disabled employees). In *Hoskins*, the plaintiff, Susan Hoskins, was a deputy sheriff whose assignments included primarily positions involving the transportation of prisoners from jail to detention. 227 F.3d at 722. As a result of a non-work related injury in 1996, Hoskins could no longer perform her former job. *Id.* at 723. Hoskins' employer informed her that no light duty positions were available, and Hoskins refused to consider several positions that involved significant reductions in her pay. *Id.*

The court considered Hoskins' proposed accommodations.[1] *Id.* at 728. Among oth-

---

1. Hoskins also suggested that she be reassigned to an intake position. *Hoskins*, 227

er things, Hoskins proposed that she be reassigned to a position in one of the control booths within the county jail facility. According to the defendants, reassignment to a control booth would not be reasonable, because the duties were considered "easier" and therefore all of the deputies rotated through the position. *Id.* at 730. The court held that reasonable accommodation did not include converting a rotating or relief position into a permanent position. *Id.* The court found that an employer is not required to create a new job in order to reassign a disabled employee and that Hoskins' request would "essentially require the creation of a new position rather than reassignment to an otherwise existing vacant one." *Id.* Therefore, the court concluded that Hoskins had not met her burden of showing that her proposed accommodation was a reasonable one. *Id.*

In determining that Hoskins was not entitled to placement in the temporary position, the court relied on the Seventh Circuit's decisions in *Hendricks–Robinson v. Excel Corp.*, 154 F.3d 685, 696–98 (7th Cir.1998), and *Dalton*, 141 F.3d at 677–80. Both *Hendricks–Robinson* and *Dalton* involved permanently disabled employees who requested reassignment into temporary light-duty positions which their employers reserved for employees recuperating from temporary medical restrictions. The Seventh Circuit held that "[t]he ADA does not compel an employer to reduce the number of bona fide temporary jobs it has set aside . . . and to convert them to permanent positions for its disabled employees." *Hendricks–Robinson*, 154 F.3d at 697; *Dalton*, 141 F.3d at 680. According to the *Hendricks–Robinson* court, "it would

frustrate the ADA for permanently impaired employees to fill temporary light-duty assignments when those jobs have been set aside specifically for recuperating employees." 154 F.3d at 697. Moreover, the court recognized that "[i]f the light duty positions truly are temporary, [the employer is] not required to convert them into permanent ones for the permanently restricted employees." *Id.* (citing *Dalton*, 141 F.3d at 680).

Thompson first argues that an issue of fact exists as to whether the BRP operator position was truly temporary in nature. In support of his claim, Thompson relies on the *Hendricks–Robinson* court's finding that there was an issue of fact as to whether light-duty positions that were formerly permanent, but reclassified as temporary, were truly temporary positions because the positions had no end-date, no specific period for holding the job, and were not designated as temporary. *Id.* at 697–98. The instant case is distinguishable. First, the DuPont employees who volunteered for the BRP operator positions were told that the positions were temporary and would exist only for a certain period of time. One such DuPont employee testified that the position "originally started [ ] for six months, but [ ] went beyond that . . . . [to a] year." While there was no specific end in sight for the BRP operator position in September of 1998, the position was designed as a temporary position to be performed until the inventory system was computerized. Next, the job description clearly indicates that the BRP operator position was temporary. While it is now known that the BRP position was made

F.3d at 729. The court recognized that "an employer may be required to reassign an individual to a position that is currently unavailable but that will become vacant within a reasonable amount of time." *Id.* The court, however, found that the intake position was

neither available at the time the defendant attempted to find a suitable accommodation, at the time she was fired, or "anticipated in the near future," because the position was created over a year later. *Id.*

permanent in July of 2000, there is no evidence that DuPont could have anticipated this in the fall of 1998. Finally, while some BRP operator positions apparently survived the transition from temporary to permanent, others did not. Therefore, Thompson has failed to establish that there is a genuine issue of material fact regarding whether the BRP operator position was truly temporary.

Thompson next argues that even if the BRP operator position was truly a temporary position, the fact that it was a temporary position should not have put an end to the inquiry of whether it was a reasonable accommodation. Thompson's request to be placed in the BRP operator position, a temporary position at the time he made the request, essentially would have required DuPont to create a new permanent position and would not have been an accommodation to Thompson's permanent medical restrictions. As the *Hoskins* court stated, an employer is not required to create a new position in order to reassign a disabled employee. *Id.* at 730. Moreover, *Hoskins*, *Hendricks–Robinson*, and *Dalton* suggest that a temporary position is not a reasonable accommodation for an individual with a permanent disability when placement in such a temporary position would result in the creation of a new, permanent position.

Thompson contends that while DuPont was not required to convert the BRP operator position into a permanent position, DuPont should have placed him in the

position temporarily while the parties continued to investigate other alternatives.[2] Such a flexible, open-ended approach would require employers to constantly assess newly vacant positions for an unknown and possibly indefinite period of time. Under the position advocated by the dissent, employers would no longer simply conduct a review of vacant positions to determine if any such position is a reasonable accommodation. Instead, the dissent's position would require employers to place a permanently disabled employee in any existing temporary position, without regard to its nature or duration, and conduct a continuing review of any position that becomes vacant while the employee is in the temporary position. Such an ongoing obligation could easily require the employer to place the permanently disabled employee in a string of temporary positions, a result that is not in accord with the ADA or our case precedent. As this court stated in *Monette*, "employers simply are not required to keep an employee on staff indefinitely in the hope that some position may become available some time in the future." 90 F.3d at 1187.

Assigning Thompson to the temporary BRP position while awaiting a suitable alternative permanent position to become vacant is also problematic because of the nature of the position. According to the dissent, the BRP position differs from the "rotating" position at issue in *Hoskins* that a plaintiff has "requested be made perma-

---

**2.** The dissent asserts that Thompson's request "was to remain in the BRP position, a position first created as 'temporary' to perform a certain function, for the life of the position." Thompson, however, does not argue that he requested to be assigned to the BRP position "for the life of the position." Instead, he claims that DuPont should have placed him in that temporary position while it continued to investigate other alternatives for his employment. The dissent also argues that "[t]here is

no logical difference between placing a temporarily disabled employee in a set-aside position until such time that the employee has ceased to be disabled, and placing a permanently disabled employee in a temporary, but nonset-aside, position until such time that the position has ceased." The logical difference, however, is that the first placement is a reasonable accommodation of a temporary disability, while the second is not a reasonable accommodation of the permanent disability.

nent to the detriment of co-workers." Rather, the dissent contends, assigning Thompson to the BRP position would have permitted him to remain "on the job until the BRP position ran its course or became permanent." The BRP position, however, was created with the understanding that the employee working in the position could still perform his production responsibility if needed. Therefore, Thompson could have been called back to the production job at any time; a job he was unable to perform. In order to accommodate Thompson's permanent disabilities, DuPont would have been required to limit Thompson's duties to those associated only with the temporary BRP position. To do so would create an entirely new position, that of a permanent BRP operator. Under *Hoskins,* DuPont was not required to place Thompson in such a temporary position when the placement would essentially result in the creation of a new position.

In addition, if the BRP operator position came to an end, as was envisioned and as occurred in some cases, Thompson, unlike other non-disabled employees in the position, could not simply return to his full-time production duties. Instead, Thompson would again face the prospect of total and permanent disability retirement unless some other reasonable accommodation could be identified. There is no evidence, however, that if the BRP operator position had come to an end, some other reasonable accommodation would have been available. As we previously recognized, DuPont had no obligation to upgrade the BRP position to permanent or indefinite status while awaiting a possible long-term solution. *Monette,* 90 F.3d at 1187; *cf. McCreary v. Libbey–Owens–Ford Co.,* 132 F.3d 1159, 1165 (7th Cir.1997) ("Occasional opportunities to work in another department are not equivalent to a vacancy for a permanent position."). Accordingly, the BRP position, as it existed in 1998, was not a position that could reasonably accommodate Thompson's permanent disabilities.

## B. The Warehouse Controller Position

Thompson also claims that the position of warehouse controller was a reasonable accommodation. The job description for a warehouse controller states that the job requires the following: (1) standing, walking, and some combination of stooping, kneeling, crouching or crawling between one-third and two-thirds of the time; (2) the lifting of weights up to 25 pounds between one-third and two-thirds of the time; and (3) occasional lifting of up to 50 pounds. Thompson argues that there is a genuine issue of material fact regarding whether such duties are "essential functions" of the job and contends that he was qualified to perform the essential functions of the job as described by Raymond Baker, who has worked as a warehouse controller for approximately six years, despite his medical restrictions.

Baker testified that between eighty and ninety percent of his time performing the warehouse controller position is sedentary and that any walking is limited to distances of less than 100 feet. The remainder of Baker's time is spent verifying shipments which requires standing at a work bench and occasionally operating a stand-up forklift-like vehicle. According to Baker, he also packages quart and gallon containers and five-gallon pails of paint, which weigh between forty-five and fifty-five pounds, for shipment to customers. While packing paint is a "minimal part" of his job, Baker testified that this function requires lifting, pushing, and carrying of containers, and that it is sometimes necessary to reach up into shelves that are seven and eight feet high or to bend down and reach into lower shelves to retrieve these containers. Baker testified that handling the five gallon pails "can be a problem," and that, if they are not lifted or handled prop-

erly, "you end up with a lot of neck and back and shoulders ... aching quite a bit" and the task can prove "rather injurious." However, Baker testified that some employees with physical restrictions are excused from handling the five-gallon pails.

Even assuming that Baker's testimony supersedes the job requirements set forth in the formal written job description for the position of warehouse controller, this evidence does not raise a genuine issue of fact as to the essential functions of the position or whether Thompson could perform such essential functions. While the position may involve sitting at a computer for the majority of the time, significant aspects of the position, totaling at least ten to twenty percent of the position. require walking, standing, lifting, bending, handling quart and gallon containers, and other non-sedentary activities. Clearly, the warehouse controller position is not 100 percent sedentary, as required by Thompson's medical restrictions set forth in Narten's July 9, 1998, note.[3] Therefore, the warehouse controller position is not a reasonable accommodation in light of Thompson's medical restrictions.

## C. The R & D Lab Position

■ Finally, Thompson claims that "R & D Lab" positions are reasonable accommodations of his medical conditions. DuPont argues that reassignment to these positions would have constituted a promotion, because the positions involve higher earning potential and greater authority than Thompson's previous position of paint dispersion operator. It is well settled that a "reassignment will not require ... promoting the disabled employee." *Cassidy v. Detroit Edison Co.*, 138 F.3d 629, 634 (6th Cir.1998). In determining the equivalency of positions, it is necessary to review the pay, status, benefits structure, and other relevant factors. *See Hoskins,* 227 F.3d at 729–31.

Thompson claims that a transfer from a production job to a lab job is a lateral move that can result in a loss of pay and therefore does not constitute a promotion. Thompson further contends that "no increased authority or supervisory responsibilities" accompany the transfer. In support of his claim, Thompson relies on the testimony of two DuPont employees who moved from production jobs to positions in the R & D lab. Those employees testified that their salaries either increased or remained the same and that they did not supervise any co-workers. Both employees offered purely anecdotal testimony regarding their transfer and have no person-

---

**3.** Thompson argues that the district court erred in relying on the medical restrictions set forth in Narten's note, because there was evidence that Thompson was not restricted to 100% sedentary work and that he could perform work within less stringent restrictions. Thompson presents no more credible evidence of this theory than he did before the district court. The district court correctly identified the numerous flaws in Thompson's argument. Thompson relies on the September 1, 1998, letter from his neurologist, Watts, opining that Thompson was able to work and that a 100% sedentary position was not required. Watts, however, was treating Thompson's back condition, and "his opinion as to this disability says nothing about the restric-

tions necessitated by [Thompson's] hip condition, which was being treated by Narten." *Thompson v. E.I. DuPont,* 140 F.Supp.2d 764, 784 (E.D.Mich.2001). Thompson also argues that Narten's July 9 note should be read in light of Narten's "earlier comments to Dr. Khalil in late June of 1998 that, following [Thompson's] next office visit, he might be approved for light duty work." *Id.* The note, however, followed the phone conversation and clearly set forth the restrictions as opposed to a vague reference to "light duty work." Finally, Thompson "testified at his deposition that, in recent job searches, he has continued to operate under the restrictions identified by Dr. Narten in July and August of 1998." *Id.* at 784 n. 16.

al knowledge of Thompson's situation. In contrast, Robert Cannon, an employee relations supervisor at DuPont, testified that "[r]eassignment from Dispersion Operator to any of the lab positions would constitute a promotion because, among other things, the earning potential in these positions is far greater than that in a production job." Moreover, Cannon stated that the lab positions have increased authority. Accordingly, Thompson has failed to submit evidence sufficient to create a genuine issue of material fact as to whether the R & D Lab positions constitute a reasonable accommodation.

### III.

For all the reasons set forth above, we affirm the judgment of the district court.

ERIC L. CLAY, Circuit Judge, dissenting.

CLAY, Circuit Judge.

The open-ended temporary BRP position was a reasonable accommodation of Plaintiff's disability for the life of the position. I would therefore reverse the district court's order granting summary judgment in favor of DuPont.

The majority recognizes that at the time Plaintiff requested to be placed in the then temporary BRP position, Plaintiff was not asking that du Pont place him there permanently; rather, Plaintiff requested that DuPont place him in the BRP position for the life of the position, how ever long that period may have been.[1] It may be true that Plaintiff requested that DuPont keep an eye out for a position that would have been a reasonable accommodation of his

disability while he performed the BRP job; however, this does nothing to change the fact that while in the BRP position, Plaintiff was functioning as an employee until such time that the BRP position ended or became permanent. The majority nonetheless concludes that Plaintiff's request was not a reasonable accommodation of his disability because the case law indicates that temporary positions are not reasonable accommodations for individuals with permanent disabilities, and that the flexible open-ended approach suggested by Plaintiff was not required under the Americans with Disabilities Act ("ADA"). I disagree with the majority's interpretation of the relevant case law in this regard, as well as its interpretation of the ADA's requirements.

The majority may be correct that the relevant jurisprudence suggests that a temporary position is not a reasonable accommodation for an individual with a permanent disability when placement in the temporary position would result in the creation of a new, permanent position. However, placing Plaintiff in the BRP position for the life of the position would not have resulted in DuPont creating a new, permanent position. Instead, placing Plaintiff in the then labeled "temporary" BRP position would have been a reasonable accommodation until the position ended or was made permanent. Indeed, nothing in the jurisprudence prevents such a result.

For example, *Hoskins v. Oakland County Sheriff's Dep't*, 227 F.3d 719, 730 (6th Cir.2000), does not support the finding that a temporary position can never be a reasonable accommodation of a permanent

---

1. Contrary to the majority's claim, Plaintiff indeed argues that the BRP position would have been a reasonable accommodation for the life of the job. *See* Plaintiff's Br. at 30 ("Here, reassigning Plaintiff to the BRP would have allowed him to continue his employment with the company and to perform the essential functions of the job for as long as the BRP position lasted. Therefore, the accommodation was reasonable in the sense that it was efficacious and it would have cost Defendant nothing.").

disability. In *Hoskins,* the plaintiff was a deputy sheriff whose duties included transporting prisoners from the county jail to detention which, from time to time, required the plaintiff to physically restrain the inmates. *Id.* at 722. Multiple non-work-related injuries suffered by the plaintiff when she was crushed by a horse left her unable to restrain the inmates if necessary. *Id.* Thus, these injuries prevented the plaintiff from performing the essential functions of her job, and the plaintiff sought reassignment as a form of reasonable accommodation. *Id.* at 728.

Among other requested positions, the plaintiff requested that she be permanently reassigned to a position in one of the control booths within the jail facility. 227 F.3d at 729–30. The job in the control booth was considered easier than most jobs in the main jail so, in fairness, the position was rotated in order to give every deputy an opportunity to work at this easier job. *Id.* at 730. The defendant employer argued that because the control booth position was a rotating one, it was considered a temporary position, and reassignment of the plaintiff to the position on a permanent basis would improperly require the defendant to create a new position for the plaintiff. *Id.*

We ultimately agreed with the defendant, noting at the outset of our decision that we had "not before had occasion to address the issue of whether a reasonable accommodation would include turning a rotating or relief position into a permanent position." *Id.* Because the issue was one of first impression, we looked to the Seventh Circuit for guidance. *Id.* Specifically, we looked to the Seventh Circuit's decisions in *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685, 697 (7th Cir.1998) and *Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 680 (7th Cir.1998), wherein the Seventh Circuit was faced in both

cases with plaintiffs who sought permanent reassignment to job positions deemed to be temporary set-aside positions reserved for employees recuperating from temporary restrictions. The Seventh Circuit reasoned that "it would frustrate the ADA for permanently impaired employees to fill temporary light-duty assignments when those jobs have been set aside specifically for recuperating employees." *Hendricks–Robinson,* 154 F.3d at 697. Relying on this reasoning, this Court in *Hoskins* opined:

> Although these Seventh Circuit cases are not directly on point, as they involved temporary light-duty positions for recuperating employees rather than a relief position, we nevertheless find them instructive. Like the plaintiffs in *Hendricks–Robinson* and *Dalton,* Hoskins suggests that she be assigned to a rotating-type job on a permanent basis. We agree that Hoskins's request would essentially require the creation of a new position rather than reassignment to an otherwise existing vacant one. As we have made clear, an employer's duty to reassign an otherwise qualified disabled employee does not require that the employer create a new job in order to do so. We therefore conclude that Hoskins has not met her burden of showing that her proposed accommodation is a reasonable one.

*Hoskins,* 227 F.3d at 730 (citations and footnote omitted).

Here, unlike in *Hoskins,* the BRP position, although labeled a temporary position, was not a "rotating" or "relief" position that Plaintiff requested be made a permanent position to the detriment of co-workers. Rather, the BRP position requested by Plaintiff as a reasonable accommodation was one wherein Plaintiff, like some of his co-workers, could have remained on the job until the BRP position

ran its course or became permanent. In what amounts to an inappropriate determination of fact, the majority concludes that the BRP position was one wherein it was understood that the worker assigned to the position could return to his previous position if called upon, thereby making the position a "rotating" one. However, this conclusion not only fails to view the evidence at summary judgment in the light most favorable to Plaintiff, it fails to consider the meaning of "rotating" as that term is commonly known and as that term was used in *Hoskins*.

A question of fact remains as to whether the BRP position could be considered a "rotating" position in that Defendant's plant supervisor testified that those individuals who transferred to the BRP position did so "with the understanding" that if there was work to be preformed in the worker's original position, that worker would be called from the BRP position and would return to his "normal" job. (J.A. at 105.) Indeed, there is nothing in the record to indicate that temporary BRP workers in fact rotated between the two positions; instead, the record indicates that some workers remained in the BRP once they transferred there, thereby creating a question of fact as to whether the BRP position was in fact a rotating one. This is unlike in *Hoskins* where it was policy and practice for the workers to rotate in and out of the control booth position for purposes of allowing all workers an opportunity to enjoy the less stressful control booth position. *See* 227 F.3d at 730.

In addition, even if Plaintiff had been called back to his original position from the BRP position, the worst result would have been that Plaintiff would have had to go on disability at that time. Allowing Plaintiff to remain in the BRP position until he was called back or until the position ceased to exist would have benefited Plaintiff. This

is because the later in time Plaintiff was placed on total and permanent disability, the longer Plaintiff would have benefited from his salary in full inasmuch as while under total and permanent disability, Plaintiff receives sixty percent of his most recent annual earnings. Similarly, the later that Plaintiff was placed on total and permanent disability, the longer he would have received his medical benefits in full inasmuch as under the total and permanent disability policy, Plaintiff's full medical benefits continued on for two years after termination.

Plaintiff's claim is also inapposite to the Seventh Circuit's decisions in *Hendricks–Robinson*, 154 F.3d at 697, and *Dalton*, 141 F.3d at 680, inasmuch as Plaintiff is not requesting that a temporary position specifically set aside for temporary light duty work be converted to a permanent position. However, this case is like *Hendricks–Robinson* to the extent that a question of fact remains for trial as to whether the BRP position to which Plaintiff sought reassignment was a "temporary" position. *See* 154 F.3d at 697–98. Plaintiff proffered evidence that although the BRP position was labeled as "temporary," it had all the characteristics of a permanent position in that Defendant provided no end-date for the position, those who wanted to continue performing the BRP position were ultimately maintained there, workers had performed in the BRP position for at least two years at the time Plaintiff initially requested that he be transferred, and the position remained open for more than three years when in June of 2000, after Plaintiff had been placed on total and permanent disability, the position was labeled as permanent. Thus, as in *Hendricks–Robinson*, a question of fact remains as to whether the BRP position was a "temporary" position, or merely labeled as such by Defendant. *See id.* at 698 (finding that a question of fact remained for trial as to

whether the light-duty jobs were actually reserved for those individuals needing temporary accommodations of their disabilities or whether the jobs had been treated as permanent positions).

Despite these distinctions, the majority would nonetheless reject Plaintiff's argument that the BRP position was a reasonable accommodation of his disability, on the basis that such a flexible open-ended approach is not required by the ADA. However, the Equal Employment Opportunity Commission ("EEOC") instructs us that the ADA should be interpreted with such flexibility in mind. For example, the EEOC's Technical Assistance Manual provides that

> [i]f an employer already has a vacant light duty position for which an injured worker is qualified, it might be a reasonable accommodation to reassign the worker to that position. If the position was created as a temporary job, a reassignment to that position need only be for a temporary period.

*EEOC: Technical Assistance on Title I of ADA.* 8 Fair Empl. Prac. Manual (BNA) § 9.4 at 405:7057–58 (1992). Although it is true that this directive from the EEOC applies to employees with temporary disabilities who are expected to recover and return to their former job positions, the EEOC's directive is a clear indication that an employer is to provide some flexibility when attempting to accommodate a disabled employee under the ADA. *See Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 579 n. 8 (6th Cir.2000) (noting that it is well accepted in the jurisprudence that the EEOC's interpretation of the civil rights statutes, while not controlling, are to be given "'great deference.'") (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 434, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)). There is no logical difference between placing a temporarily disabled employee in

a set-aside position until such time that the employee has ceased to be disabled, and placing a permanently disabled employee in a temporary, but nonset-aside, position until such time that the position has ceased. In either case, the ADA's reasonable accommodation requirement is being applied in a flexible manner so as to allow a disabled employee to continue working.

Simply stated, the case law upon which the majority relies in rejecting Plaintiff's claim that the BRP position, although labeled as temporary, could have served as a reasonable accommodation of Plaintiff's disability for the life of the position, is distinguishable and may actually serve to support Plaintiff's position, particularly where questions of fact remain as to whether the BRP position was a rotating or temporary position. Likewise, the majority's assertion that the ADA does not require a flexible open-ended approach when accommodating the needs of disabled employees is contrary to the approach recommended by the EEOC.

Placing Plaintiff in the BRP position and allowing him to have remained there for the life of the position would not have required that DuPont transform a temporary position into a permanent one, and would have allowed Plaintiff to serve as a productive member of DuPont's workforce while receiving full pay and medical benefits for that much longer period of time. This is the result contemplated under the law, and it is upon this basis that I respectfully dissent.